JODI LINKER
Federal Public Defender
Northern District of California
JOHN PAUL REICHMUTH (CASBN 194844)
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:    (510) 637-3500
Facsimile:    (510) 637-3507
Email:        john_reichmuth@fd.org

Counsel for Defendant Escobar-Escobar

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>EDGARDO ESCOBAR-ESCOBAR,<br><br>Defendant. | **Case No.:** CR 24–620 HSG<br><br>**DEFENDANT'S SENTENCING MEMORANDUM** |

TABLE OF CONTENTS

I.     Introduction ................................................................................................ 1

II.    Legal Framework ......................................................................................... 1

    A.    Recent, devastating, and untreated childhood trauma mitigates the acts in this case and lessens the need for prison ...................................... 1

    B.    Mr. Escobar-Escobar's offense is closely related to his own abuse and neglect .. 3

    C.    Immaturity ........................................................................................... 8

    D.    Five years in federal prison for Mr. Escobar-Escobar will be harsh ................... 9

    E.    Guaranteed Deportation and almost certain persecution will follow prison ....... 11

    F.    The Guidelines in the Plea Agreement are correct ............................................ 11

       1.    Objection Number One: PSR ¶25 (U.S.S.G. §§2G2.1(a), 2.2(c)(1)): .... 12

       2.    Objection Number Two: PSR ¶26 (USSG §2G2.1(b)(1)(B)): ................ 14

       3.    Objection Number Three: PSR ¶27 (USSG §2G2.1(b)(2)(A)): .............. 15

III.   CONCLUSION .......................................................................................... 15

TABLE OF AUTHORITIES

**Federal Cases**                                                                                        **Page(s)**

*Johnson v. Texas*,
    509 U.S. 350 (1993) ................................................................................................ 9

*Jones v. Mississippi*,
    141 S. Ct. 1307 (2021) ....................................................................................... 8, 9

*Koon v. United States*,
    518 U.S. 81, 116 S. Ct. 2035 (1996) .................................................................. 10

*Miller v. Alabama*,
    567 U.S. 460 (2012) ................................................................................................ 8

*United States v. Barker*,
    771 F.2d 1362 (9th Cir. 1985) ............................................................................... 1

*United States v. Booker*,
    543 U.S. 220 (2005) ................................................................................................ 1

*United States v. Carty*,
    520 F.3d 984 (9th Cir. 2008) ................................................................................. 1

*United States v. Crooker*,
    360 F. Supp. 3d 1095 (E.D. Wash. 2019) ..................................................... 13, 14

*United States v. Gagliardi*,
    506 F.3d 140 (2d Cir. 2007) ................................................................................ 13

*United States v. Hicks*,
    985 F. Supp. 2d 1307 (M.D. Ala. 2013) ............................................................... 5

*United States v. Johnson*,
    No. 05-cr-00167-WHA-5, 2021 WL 5037679 (N.D. Cal. Oct. 30, 2021) ........... 9

*United States v. Laursen*,
    847 F.3d 1026 (9th Cir. 2017) ............................................................................. 14

*United States v. Lucas*,
    101 F.4th 1158 (9th Cir. 2024) ........................................................................... 13

*United States v. Oliver*,
    608 F. Supp. 3d 1113 (M.D. Ala. 2022) ............................................................... 8

*United States v. Overton*,
    573 F.3d 679 (9th Cir. 2009) ............................................................................... 14

*United States v. Parish*,
    308 F.3d 1025 (9th Cir. 2002) ............................................................................. 10

*United States v. Ramsay*,
    538 F. Supp. 3d 407 (S.D.N.Y. 2021) .................................................................. 8

**Federal Statutes**

8 U.S.C.A. § 1101(a)(43)(I) (West) ................................................................................ 11

18 U.S.C. § 4 ........................................................................................................... 3

18 U.S.C. § 1106 ................................................................................................... 14

18 U.S.C. § 1107 ................................................................................................... 14

18 U.S.C. § 2251 ................................................................................................... 13

18 U.S.C. § 2255 ................................................................................................... 14

18 U.S.C. § 2422(b) .............................................................................................. 13

18 U.S.C. § 3553(a) ................................................................................................ 1

18 U.S.C. §§ 2251, 2251A .................................................................................... 11

U.S.S.G., 18 U.S.C. § 5H ........................................................................................ 5

**Other**

U.S.S.G. § 1B1.2(a) ........................................................................................ 12, 13

U.S.S.G. § 2G2.1 ...................................................................................... 12, 13, 14, 15

U.S.S.G. § 2G2.2(c)(1) ................................................................................ 12, 13, 14

U.S.S.G. § 6A1.3(a) .............................................................................................. 12

1

2    **I.        Introduction**

3            This is a tragic case, because Mr. Escobar-Escobar committed this offense only 10 or 11 years

4    after ███████████████████████████████. He is also likely to be victimized in prison and

5    upon deportation to El Salvador. The parties and Probation Office have invested significant time and

6    consideration into their recommendations. All agree that Mr. Escobar-Escobar, who had never

7    undergone any treatment for his own victimization, committed a serious offense and has shown

8    genuine remorse. And no one disputes that Mr. Escobar-Escobar had no criminal behaviors before the

9    charged conduct. All agree that he should be sentenced to 60 months in prison, with supervised

10   release to follow.

11   **II.    Legal Framework**

12           The Court should sentence Mr. Escobar-Escobar to 60 months in prison.  The Court is aware of

13   the directives of *United States v. Booker*, 543 U.S. 220 (2005), and the sentencing factors listed in 18

14   U.S.C. § 3553(a).  The Court must consider, among other factors, the advisory sentencing range, the

15   nature and circumstances of the offense, the history and characteristics of the defendant, and the need

16   to avoid unwarranted sentence disparities among similarly situated defendants.  18 U.S.C. §

17   3553(a)(1), (a)(4) and (a)(6).  The factors detailed in § 3553(a) assist the Court in fulfilling the

18   mandate to make "an individualized assessment of a particular defendant's culpability rather than a

19   mechanistic application of a given sentence to a given category of crime."  *United States v. Barker*,

20   771 F.2d 1362, 1365 (9th Cir. 1985).  "The overarching statutory charge for a district court is to

21   'impose a sentence sufficient, but not greater than necessary," to serve the statutory purposes of

22   sentencing.  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (quoting § 3553(a)).

23           In other words, every day of custody must be necessary.  Here, custody is not necessary beyond

24   five years.  Mr. Escobar-Escobar, who has never committed another crime or served time, never

25   undergone treatment for severe childhood abuse, and never received sex offender treatment, will be

26   deported when he finishes his term.  Prison is not necessary beyond 60 months in such circumstances.

27   **A.        Recent, devastating, and untreated childhood trauma mitigates the acts in this case
             and lessens the need for prison**

28           Mr. Escobar-Escobar has a history of abuse and victimization. Federal Public Defender

1   Mitigation Specialist Amanda Merfeld, L.C.S.W., has completed an extensive report summarizing

2   biopsychosocial information from Mr. Escobar-Escobar's life. Ex A, Amanda Merfeld,

3   *Memorandum*, November 24, 2025 (filed under seal).

4          It is difficult to rank the caustic, inhumane factors that shaped Mr. Escobar-Escobar. He links

5   his Posttraumatic Stress Disorder (PTSD) to parental abuse. *Id.* at 8. That may stem from an inability

6   to look at the other traumas he faced. But it was remarkably damaging. Ms. Merfeld reports:

> Mr. Escobar-Escobar's childhood environment in El Salvador was filled
> with chaos and violence. Mr. Escobar-Escobar resided in El Salvador until
> the age of 16. For as long as he can remember his father Walter has
> struggled with alcoholism. His father Walter became violent when drunk.
> One of Mr. Escobar-Escobar's first childhood memories (age 5) was
> witnessing his intoxicated father physically abuse his mother relentlessly
> on multiple occasions. Mr. Escobar-Escobar witnessed his father Walter
> slap his mother Blanca in the face and shove her to the ground. The
> physical abuse of his mother was such a regular occurrence he created a
> safety protocol during his mother's beatings of hiding under the dining
> room table to protect himself from his father. *Id.* at 2.

13   This abuse was not only witnessed. It extended directly to Mr. Escobar-Escobar:

> He recollects his father would beat him with a stick unprovoked, slap him
> in the face, and threaten him with beatings if he did complete chores or
> earn straight A's in school.[1] His father's violence made him fearful of
> disobeying him and cognizant of being unsafe in his own home. *Id.* at 2.

16   It is not surprising that, in this chaotic environment, Mr. Escobar-Escobar ████████████

17   ████████████████████████████

18   ████████████████████████████████████████████

19   ████████████████████████████████████

20   ████████████████████████████████████

21   ████████████████████████████████████

22   ████████████████████████████████████

23   ██████████████████████████

24   ████████████████████████████████████████████████

25   ████████████████████████

26   ████████████████████████████████████

27   ─────────────

28   [1] Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.:
0971 4:24CR0620-001 HSG prepared September 18, 2025, Page 12

DEFENDANT'S SENTENCING MEMORANDUM
*ESCOBAR-ESCOBAR*, CR 24–620 HSG

1

2

3    Mr. Escobar-Escobar also experienced bullying for his height and appearance. *Id.* at 4. And he

4    was beaten by a gang during his teenage years. *Id.* His ▮▮▮▮▮▮▮ bullying, beating, and maybe

5    even paternal abuse, might seem like a series of misfortunes, but they follow a theme: the horrific

6    treatment of LGBTI people in El Salvador. The UK government notes, in giving guidance on asylum

7    claims:

8    LGBTI persons, particularly trans persons, are vulnerable to
     discrimination, violence and hate crimes from state actors and society
9    generally. Gangs are also reported to coerce LGBTI persons to assist them
     to carry out their criminal activities and subject them to violence (see
     Lesbian, gay, bisexual, trans and intersex persons). In the reported case
10   Mx M (gender identity – HJ (Iran) - terminology) El Salvador [2020]
     UKUT 00313 (IAC), heard 30 September 2020 and promulgated on 22
11   October 2020, the Upper Tribunal, while not issuing country guidance,
     found on the evidence before it '… that a transwoman, or someone
12   perceived as such, who tries to live openly in El Salvador would face
     persecution which may include murder, rape and other sexual violence,
13   physical assault and coercion into criminal activities.' UK Home Office,
     *Country Policy and Information Note El Salvador: Gangs*, Dec. 19, 2022
14   at p12.

15    The accounts given by Mr. Escobar-Escobar are much more credible when one views them in

16   context. Mr. Escobar-Escobar is and was small and effeminate. Even recently, the staff at FCI

17   Mendota remarked that he was a transgender woman. Ex A at 9. Knowing these facts, his accounts of

18   childhood ring true, tragic, and common.

19    It is not Mr. Escobar-Escobar's wish or purpose to paint himself as the victim in this case. It is

20   central to the sentencing factors, however, to consider whether Mr. Escobar-Escobar has profound

21   untreated sequelae of hate crimes, and whether these manifested, after 22 years without even an

22   allegation of antisocial behavior, in the offense conduct.

23    **B.    Mr. Escobar-Escobar's offense is closely related to his own abuse and neglect**

24    Mr. Escobar-Escobar did not choose the path that led him to this Court. He is a decent person

25   who has no history of antisocial behaviors. His friends and coworkers describe him as a sweet and

26   gentle person, a great employee who tries to cheer them up and lives for his own mother. Ex C,

27   Letters. One co-worker writes:

28    [H]e is one of the most kindest and loving humans I have ever met and all
      he does is for his mother that is in El Salvador and his wife that is here

with us. Edgardo has always been very positive at our workplace in my eyes he was the light of our work place no matter what was going on he always had a smile on his face. When I was feeling sad he always made me feel better and would always make me laugh. He was very social to everyone smiled at everyone helped anyone who was in need he never looked mad or sad he was always just filled with joy. When my son had a horrible car accident he took initiative in asking me to take over my shifts so I can be with my son not anyone would be so kind to do that. He was also always talk about his mother and how much this mother meant to him and he was always send her money because he was her financial support he always would tell me that he needs to send her money so she can have food every day and a roof over her head. Letter of Fabiola Alonso, Ex. C.

In fact, Mr. Escobar-Escobar is likely what psychologists call a regressed offender: someone who exhibits a temporary appearance of primitive and now-inappropriate sexual behavior after more mature forms of expression have been attained.[2] He lived a responsible and industrious life until the age of 22, working 14 hours per day, doing well in school, providing for his mother, supporting his friends, avoiding drugs and alcohol, and staying free of law enforcement contacts.

But Mr. Escobar-Escobar could not mask his horrific experiences forever, and he became addicted to sexual images. This is not unusual. There is a direct link between childhood victimization and sexual offending:

> This phenomenon, known as "victim to victimizer" (see Ryan, 1989), is one of the few accepted notions in criminology (Miley et al., 2020). Several empirical studies have established a causality link between childhood trauma and a higher risk of offending behavior during adolescence and adulthood (Broidy et al., 2006; Jennings et al., 2010). Comparisons between the general population and incarcerated individuals have shown that a significant proportion of sexual offenders experienced victimization during childhood (between 20% to 70%, see Levenson & Socia, 2016; Weeks & Widom, 1998). Julien Chopin, Francis Fortin, Sarah Paquette, *Childhood victimization and poly-victimization of online sexual offenders: A developmental psychopathology perspective*, Child Abuse & Neglect, Volume 129, 2022, 105659, ISSN 0145-2134, https://doi.org/10.1016/j.chiabu.2022.105659.

Child abuse and neglect, not just ███████████ can also lead to the same behaviors, as well:

> Insecure attachments are also associated with emotional dysregulation, which can contribute to sexualized coping and congruence with minors (Stinson et al., 2008). As such, the neuro-cognitive and psychosocial consequences of early trauma are thought to contribute to the potential for sexual offending, although the exact mechanisms remain unclear.

---

[2] Dominique A. Simmons, *Adult Sex Offender Typologies*, U.S. DEP'T OF JUSTICE (Jul. 2015), https://smart.ojp.gov/sites/g/files/xyckuh231/files/media/document/adultsexoffendertypologies.pdf.

> Melissa D. Grady, Jill S. Levenson, Jessica Glover, Shelley Kavanagh, Katharine Carter "Hurt People Hurt Other People": The Link Between Past Trauma and Sexual Offending, *Sexual Offending: Theory, Research, and Prevention* 2022, Vol. 17, https://doi.org/10.5964/sotrap.7361

These relationships between trauma and harmful outcomes can also be understood through the lens of Adverse Childhood Experiences (ACEs). The 10 ACEs are: (1) emotional abuse; (2) physical abuse; (3) sexual abuse; (4) mother treated violently; (5) substance abuse in the household; (6) mental illness in the household; (7) parental separation or divorce; (8) incarcerated household member; (9) emotional neglect; and (10) physical neglect. In one study, someone who faced four ACEs was "460 percent more likely to suffer from depression than someone with an ACE score of 0" and "an ACE score greater than or equal to 6 shortened an individual's lifespan by almost 20 years."[3] Mr. Escobar-Escobar scores a 7. PSR ¶ 61.

The likely impact of that incredibly traumatic background cannot be overstated when determining an appropriate sentence by weighing a variance for Mental and Emotional Condition, U.S.S.G. § 5H1. Mr. Escobar-Escobar's viewing of Child Sexual Abuse Material (CSAM) may be viewed as an addiction or compulsion. And addiction is profoundly compelled by ACEs.

> For example, a male child with an ACE score of 6 has a 4600% increase in the likelihood of later using intravenous drugs. This relation to adverse childhood experiences is powerful and is graded at every step; it provides a perfect dose-response curve; and epidemiologically, these outcomes are nearly unique in magnitude. Because no one shoots heroin to get endocarditis or AIDS, might heroin then be used for relief of profound anguish dating back to childhood experiences? Might it be the best coping device a person can find? If so, is this phenomenon a public health problem or a personal solution? How often are public health problems personal solutions?

*Hicks*, 985 F. Supp. 2d at 1310–11. Mr. Escobar-Escobar may be using CSAM for "relief of profound anguish." This also resonates strongly with the findings of Mr. Merfeld: *"From a young age Mr. Escobar-Escobar's exposure to substance abuse created normalcy surrounding the use of unhealthy coping mechanisms when facing adversity."* Ex. A at 8. ███████ has been linked to numerous poor outcomes, including "risky sexual behaviors":

> ███ has been linked to poor psychological, social, and physiological

---

[3] Felitti VJ. The Relation Between Adverse Childhood Experiences and Adult Health: Turning Gold into Lead. Perm J. 2002 Winter;6(1):44-47. doi: 10.7812/TPP/02.994. PMID: 30313011; PMCID: PMC6220625.

outcomes across the lifespan (Dube et al., 2005). For example, children who experience ███ are at increased risk of experiencing poorer mental health outcomes, such as low self-esteem (Tyler, 2002), depression (Kendler et al., 2000), dissociation (Weiss, Longhurst, & Mazure, 1999), and a history of suicide attempts (Dube et al., 2005). Children who experience ███ are also at increased risk of engaging in risky health behaviors, such as alcohol and substance abuse (Bryer, Nelson, Miller, & Krol, 1987), and risky sexual behaviors (Fergusson, Horwood, & Lynskey, 1997; Steel & Herlitz, 2005; Van Dorn et al., 2005). Ports KA, Ford DC, Merrick MT. Adverse childhood experiences and sexual victimization in adulthood. Child Abuse Negl. 2016 Jan;51:313-22.

Mr. Escobar-Escobar's exposure to extreme conditions: ███ parental abuse, and gang violence also mean that he certainly has PTSD. One population heavily affected by PTSD is deployed veterans, and the study of this population has provided a link between PTSD and compulsive and self-destructive sexual fantasy. Indeed, a study of returning Iraq and Afghanistan veterans found that 97.7% of those with post-deployment compulsive sexual behavior ("CSB")—behavior like the conduct in question—had a diagnosis of PTSD.[4] Moreover, those with more severe PTSD symptoms, such as re-experiencing, were more likely to engage in compulsive sexual behavior.[5] Compulsive sexual behavior is characterized as hypersexual behavior encompassing inappropriate or excessive urges or fantasies—exactly the conduct Mr. Escobar-Escobar pleaded guilty to.[6] One study found the prevalence of CSB in returning veterans to be 16.7%, substantially higher than the estimated rate of 3–6% in the general population.[7] Another study set the rate at 13.8%.[8] It should be no surprise, then, that Mr. Escobar-Escobar has PTSD that manifested in sexual compulsion. He comes from a war zone and has survived an experience as a child that makes him akin to a veteran or a torture survivor. Ms. Merfeld recounts:

> As a child, Mr. Escobar-Escobar resided with his parents and half-siblings from birth to seven years of age in Santa Ana, El Salvador. Santa Ana was filled with gang violence and criminal activity. His family, especially his father, received gang threats from numerous local gangs. El Salvador is known for state-sponsored and gender-based violence. Organized crime, and streets gangs are the main expressions of violence within the country.[9]

---

[4] Paden, *supra* note 43, at 691.

[5] *Id.*

[6] Shoba Sreenivasan, et al., *Military Veterans Who Are Sexual Offenders: What We Know and What We Don't Know*, 9 INTERSECTIONS BETWEEN MENTAL HEALTH AND LAW AMONG VETERANS 197 (Jack Tsai & Evan R. Seamone eds., 2019).

[7] *Id.* at 198.

[8] *Id.*

[9] Pinzon, V. G. (2022b). Containing Violence in El Salvador: Community Organization, Transnational Networks

Receiving gang threats in conjunction with his father's violence towards his mother further strengthened Mr. Escobar-Escobar's fear for his safety both in and outside of his home. When Mr. Escobar-Escobar was around seven years of age, his father left El Salvador to come to the United States (U.S.) for a better life and to escape the gang threats. Ex. TK, Merfeld Report 2-3.

Again, as with his constellation of mistreatment fitting into well-documented country conditions, Mr. Escobar-Escobar's personal account of gang violence is historically accurate. In 2015, Al Jazeera reported: "This summer has seen the highest number of homicides since the end of the bloody 13-year civil war in 1992. In fact, with around 700 murders a month, the numbers of victims in 2015 closely resemble those reported during the most violent months of the war in 1981." Manu Brabo, Gang wars in El Salvador, bloodiest year, *Al Jazeera*, Sept. 16, 2025. Santa Ana had the third highest homicide rate in El Salvador in 2019, seven percent of the national total.[10] This equates to roughly 50 gang-related homicides every month in Mr. Escobar-Escobar's city, which has a population of 250,000, akin to California's 16th largest city in population, behind Chula Vista.[11] Mr. Escobar-Escobar effectively lived in a war zone during the most formative period of his life.

There is good reason to find that Mr. Escobar-Escobar has a disease, PTSD, and that his offense is related to that disease. This disease does not require incapacitation by a lengthy term of imprisonment. Mr. Escobar-Escobar is young, untreated, and highly prosocial. His criminal conduct did not even manifest until he was 22 years of age. He should be punished for his conduct while recognizing that he should not be punished for his mistreatment or his disease. As Judge Myron Thompson observed:

> PTSD, and its contribution to [the] offense conduct, diminish[es] . . . moral culpability. As the court has previously recognized, "in meting out appropriate punishment, the court should make a good-faith attempt to ensure that the defendant is not inappropriately punished for having a disease." . . . Thus, the court has granted variances to defendants whose offense conduct was driven by drug addiction . . . and the lingering effects of childhood trauma . . . . For the same reason, jurisdictions across the country, including in Alabama, have established specialized

and State–Society Relations. https://onlinelibrary.wiley.com/doi/10.1111/dech.12748

[10] "The OASC crime and safety report for 2020 observed 'Homicides are not uniform across the country. In 2019, the municipalities of San Salvador (12%) San Miguel (10%) Santa Ana (7%), Apopa (7%), and Mejicanos (5%) were the five municipalities registering the most homicides.' Ex. TK, UK Home Office, Country Policy and Information Note El Salvador: Gangs, Dec. 19, 2022 at 41.

[11] https://datacommons.org/ranking/Count_Person/City/geoId/06

courts designed to tailor treatment, rather than sentences of incarceration, for veterans whose offense conduct stems from combat-related trauma. *United States v. Oliver*, 608 F. Supp. 3d 1113, 1117–18 (M.D. Ala. 2022) (some citations omitted).

The joint request of the parties and Probation Officer, five years in federal prison, is appropriate in this case. The offense represents a brief period of conduct that very likely stems from PTSD caused by Mr. Escobar-Escobar's own identity-based victimization.

### C.    Immaturity

Mr. Escobar-Escobar was 21, almost 22, years of age when he committed the offenses charged. And the Court "must inquire whether the human being they are about to sentence is still in many respects an adolescent." *U.S. v. Ramsay*, 538 F. Supp. 3d 407, 423 (S.D.N.Y. 2021) (reducing life sentence for defendant convicted of murder in aid of racketeering committed when he was 18); *see, e.g.*, *Miller v. Alabama*, 567 U.S. 460, 471 (2012) ("[C]hildren are constitutionally different from adults for purposes of sentencing"; they have both "diminished culpability and greater prospects for reform.").

Multiple sources of trauma had profound consequences for Mr. Escobar-Escobar that affect him deeply even today.  As researchers have recognized, "trauma can disrupt [a young person's] emotional growth," freezing them at the age of the trauma and blocking the development of more-mature coping mechanisms.  Simone Marie, *Can You Get 'Stuck' at the Age You Experienced Trauma?*, Psych Central, available at https://psychcentral.com/ptsd/signs-trauma-has-you-stuck. Unprocessed trauma can "rewire your brain in such a way that ultimately influences your thought patterns and behavioral responses as you get older." *Id.*  This case appears to be an extreme example of trauma-induced immaturity.

Sentencing courts have held that, "'youth matters in sentencing.'" *Ramsay*, 538 F. Supp. 3d at 415 (quoting *Jones v. Mississippi*, 141 S. Ct. at 1315 (2021)).  Indeed, the Sentencing Commission and many courts have acknowledged that "people may not gain full reasoning skills and abilities until they reach age 25 on average."[12]  Specifically, the prefrontal cortex, which "is utilized in impulse control, emotional reactions, executive function and decision making," is not fully developed until,

---

[12] U.S.S.C. Youthful Offenders at 5.

*on average*, age 25. *Id*. at 6-7 (emphasis added). "The commission explained that brains continue to develop until approximately age twenty-five, and that developmental differences relevant to sentencing generally persist until around that age." *U.S. v. Johnson*, 2021 WL 5037679, at *5 (N.D. Cal. 2021) (granting compassionate relief for defendant whose RICO offenses were committed when he was 18 to 19 based on defendant's "extraordinary rehabilitation while incarcerated, in combination with broader recognition of how young brains differ from adult brains"). There is no reason to think that Mr. Escobar-Escobar's brain was fully developed when he committed these offenses.

The Supreme Court agrees:

> Our cases recognize that youth is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage . . . . A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions. *Johnson v. Texas*, 509 U.S. 350, 367 (1993) (citation and internal quotation marks omitted);

Mr. Escobar-Escobar is not a mature decisionmaker, and that results from factors almost entirely beyond his control. He held his life together admirably until the age of 22, but that does not mean that he was a mature adult. On the contrary, the offense conduct suggests a fantasy of reliving childhood.

Immaturity not only relates to culpability, but it also affects deterrence and incapacitation. "The relevance of youth as a mitigating factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Johnson*, 509 U.S. at 368. Mr. Escobar-Escobar's youth influences several sentencing factors and calls for a variance.

### D.    Five years in federal prison for Mr. Escobar-Escobar will be harsh

The time Mr. Escobar-Escobar is guaranteed to spend behind bars will be exceedingly difficult. During each of those more than 1500 days, Mr. Escobar-Escobar will be subject to the harsh realities of the prison environment, including possible physical and sexual assault. Courts have held that a "defendant's unusual susceptibility to abuse by other inmates while in prison may warrant a downward departure." *United States v. Parish*, 308 F.3d 1025, 1031 (9th Cir. 2002) (citing *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035 (1996)). In *Parish*, the district court found that the

1    defendant was susceptible to abuse in prison because of a "combination" of factors: "his stature, his

2    demeanor, his naivete, [and] the nature of the offense." 308 F.3d at 1031.

3         In 1975, the journalist and activist Susan Brownmiller described prison rape as the "acting out

4    of power roles within an all-male, authoritarian environment in which the younger, weaker inmate,

5    usually a first offender, is forced to play the role that in the outside world is assigned to women."[13]

6    In its 2001 report on male rape in prison, Human Rights Watch echoed this notion and revealed a

7    broad range of factors that correlate with increased vulnerability to rape. "Specifically, prisoners

8    fitting any part of the following description are more likely to be targeted: young, small in size,

9    physically weak, white, gay, first offender, possessing 'feminine' characteristics such as long hair or

10   a high voice; being unassertive, unaggressive, shy, intellectual, not street-smart, or 'passive'; or

11   having been convicted of a sexual offense against a minor."[14] Incarcerated individuals with any one

12   of these characteristics typically face an increased risk of sexual abuse, while those with several

13   overlapping characteristics are much more likely than other prisoners to be targeted for abuse.

14        The majority of these characteristics describe Mr. Escobar-Escobar accurately:  he is young, a

15   first offender, small in size, bisexual, possessing a feminine demeanor and high voice, unaggressive,

16   not street smart, passive, and a sex offender.  He faces more than a realistic prospect of lengthy

17   protective custody and/or attack in the B.O.P. Even the Bureau of Prisons itself recognizes that sex

18   offenders are a "vulnerable population within the prison setting."[15] Mr. Escobar-Escobar ███████

19   ███████████████████████████████████████████████ corroborating the correlation between his

20   traits and abuse: ████████████████████████████████████████████

21   ██████████████████████████████████████████████████████████

22   ███████████████████████████████ Ports KA, Ford DC, Merrick MT. Adverse childhood

23   experiences and sexual victimization in adulthood. *Child Abuse Negl.* 2016 Jan; 51:313-22. Mr.

24   Escobar-Escobar will suffer each day of prison much more than many inmates, and this is a

25

26

27   [13] Susan Brownmiller, Against Our Will: Men, Women, and Rape 258 (1975).

     [14] *No Escape: Male Rape in U.S. Prisons*, Human Rights Watch,

28   https://www.hrw.org/reports/2001/prison/report1.html#_1_5 (last visited Mar. 22, 2022).

     [15] *Sex Offenders*, Fed. Bureau of Prisons

     https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp (last visited Mar. 22, 2022).

1  significant grounds for a variance.

2  **E.    Guaranteed Deportation and almost certain persecution will follow prison**

3  Mr. Escobar-Escobar is not a U.S. citizen. PSR ¶43. He will be deported once he completes his

4  sentence.[16] As his treatment as a child suggests, El Salvador is not a safe place for him. He is likely to

5  be targeted when he arrives home, just as he was growing up.

6  The Salvadoran government acknowledges the violence and discrimination that confront

7  LGBTI Salvadorans:

8  > It cannot be denied that the country is marked by high levels of violence
   > and criminality . . . .
9  > …
10 > One of the populations that are most affected by this situation is that
   > composed of LGBTI people, who, in addition to suffering from
   > widespread discrimination, also face multiple forms of violence, including
11 > acts of torture, inhuman or degrading treatment, excessive use of force,
   > illegal and arbitrary arrests and other forms of abuse, much of it committed
12 > by public security agents. *"Every Day I Live in Fear" Violence and*
   > *Discrimination Against LGBT People in El Salvador, Guatemala, and*
13 > *Honduras, and Obstacles to Asylum in the United States*, Human Rights
   > Watch 2020 at 40.

14 According to Human Rights Watch:

15
16 > UNHCR's 2016 guidelines for asylum applications of Salvadorans stated
   > that LGBT people have "consistently been targeted for attacks and murder
   > by the gangs and other sectors of society, including by the police and other
17 > public authorities" and that El Salvador's gangs have demonstrated
   > "virulent hatred and ill-treatment of persons based on of their perceived
18 > sexual orientation and/or gender identity," particularly against trans
   > women. The Inter-American Commission on Human Rights reported
19 > similar concerns." *Id.*

20 Mr. Escobar-Escobar's future in El Salvador is certain and grim. The Court should consider

21 that fact under several sentencing factors and impose a variance.

22 **F.    The Guidelines in the Plea Agreement are correct**

23 The defense contests the facts used to apply the adjustments in PSR ¶¶ 25, 26, 27. The defense

24 does not admit any offenses not admitted in the plea agreement. The Guidelines state: "[w]hen any

25 factor important to the sentencing determination is reasonably in dispute, the parties shall be given an

26

27 _____

28 [16] Defining "aggravated felony as, inter alia, "an offense described in section 2251, 2251A, or 2252 of Title 18 (relating to child pornography)." 8 U.S.C.A. § 1101(a)(43)(I) (West).

adequate opportunity to present information to the court regarding that factor." U.S.S.G.§ 6A1.3(a).

The parties have not presented and do not request any additional opportunity to present information

or an evidentiary hearing to resolve these objections. The government states that it may not meet its

burden at an evidentiary hearing if one were held:

> The government agrees with the defense that in this case, based on the facts stipulated in the plea agreement, the production guideline does not apply. The stipulated facts in the plea agreement here are not sufficient to support a conviction on production; and the application of the production guideline was not contemplated by the parties in this case.
> The government also agrees that the additional enhancements beyond those contemplated in the agreement are not supported by the facts stipulated in the plea agreement. The government agrees that for an enhancement to apply, the facts must be supported by a preponderance of the evidence, and the parties here did not contemplate an evidentiary hearing at sentencing. The government may face challenges in meeting its burden as to production facts at a hearing. In the government's view, in this instance, it is appropriate for Probation to rely on the stipulated facts in the plea agreement for the guideline calculations. Addendum to PSR at 1.

All three objections should be sustained:

### 1.    Objection Number One: PSR ¶25 (U.S.S.G. §§2G2.1(a), 2.2(c)(1)):

The Production guidelines do not apply by cross-reference in this case, because, in the first

place, the parties have not stipulated to any additional offenses beyond the facts as laid out in the plea

agreement. The Guidelines instruct that the offense-conduct Guideline is to be based on "the offense

of conviction." U.S.S.G. § 1B1.2(a). There are exceptions for cross-references such as U.S.S.G.

§2G2.2(c)(1). But the applicability of cross-referencing does not lower the burden. This is still a

matter of effectively altering the offense of conviction. The Guidelines speak of stipulations in the

plea agreement as an explicit means of triggering guidelines for a more serious offense than that of

conviction. A guideline other than the offense of conviction applies when the plea agreement

"contain[s] a stipulation that specifically establishes *a more serious offense* than the offense of

conviction." *Id.* (emphasis added) or "contain[s] a stipulation that specifically establishes the

commission of additional offense(s)." U.S.S.G. § 1B1.2(c). Here, the parties have not stipulated to

additional uncharged offenses under 18 U.S.C. §§ 2422(b) and 2251(a) or any facts that would

establish such a violation, so there is no basis for applying the higher base offense level discussed in

PSR ¶¶ 25-27.

The parties have only stipulated to limited facts as to the receipt and exchange of sexually explicit materials. The agreement states only that Mr. Escobar-Escobar sent videos of himself and received videos of minors engaging in sexually explicit conduct via the Omegle application. The plea agreement does not stipulate that any production occurred as a result of those chats, only that the minors sent videos. It does not stipulate as to the age of these victims, except that they are minors. And it does not stipulate that Mr. Escobar-Escobar's conduct rose to the level of inducement, enticement, persuasion, or coercion. It does not detail what language was used or the circumstances of alleged production, sending, or sexually explicit conduct discussed. No other facts are stipulated or proven by a preponderance of the evidence, as an adjustment of this type requires. *See United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024) (en banc).

Most importantly, in this case, the only stipulated act with regard to other minors is sending chats and videos of himself and receiving chats and videos from minors. Even had Mr. Escobar-Escobar *requested* these videos, this would not suffice to support the application of § 2G2.1. Without more, "asking" is insufficient to support pseudo-counts. *See United States v. Gagliardi*, 506 F.3d 140, 147 (2d Cir. 2007) (discussing "demarcation between 'persuading,' which is criminalized, and 'asking,' which is not . . .). In *United States v. Crooker*, for example, the district court granted the defendant's motion to vacate his conviction for production of child pornography under 18 U.S.C. § 2251 because ineffective assistance of counsel led him to plead guilty to the offense of which he was factually innocent. 360 F. Supp. 3d 1095, 1099-1100 (E.D. Wash. 2019). According to the factual basis for the plea in the plea agreement, the defendant, communicating online with a 15-year-old who said she was lying in bed and not wearing underwear said, "'I wanna see.'" *Id.* at 1100. The minor "sent Defendant a photograph of her bare [genitalia]." *Id.* The defendant responded approvingly. *Id.* at 1100-01. Agents found on the defendant's phone his communications with the minor and the photograph. *Id.* at 1101. At his plea colloquy, the defendant agreed with the government's summary of the factual basis: "'Law enforcement officers reviewed [the minor's] phone, and they discovered that the defendant had encouraged or persuaded her to send photographs of her [genitalia]. In response to questions, the 15-year-old sent a photograph depicting her bare [genitalia].'" *Id.* at 1101-02.

1    The district court, granting his § 2255 motion, concluded that it was more likely than not that

2    no reasonable juror would have convicted him. *See id.* at 1106 (stating standard for claim of actual

3    innocence). The defendant therein "exchanged sexually charged messages with Minor F, culminating

4    in his receipt of the photo taken by Minor F. . . . This is not the same as suggesting Minor F take the

5    photo or posing in the photo with Minor F." *Id.* at 1107. The conduct the defendant admitted to in his

6    plea thus did not involve the "proof of active or coercive conduct by a defendant upon a minor'" that

7    the production statute requires. *Id.* (citing *United States v. Laursen*, 847 F.3d 1026 (9th Cir. 2017);

8    *United States v. Overton*, 573 F.3d 679 (9th Cir. 2009)). The district court also found insufficient

9    evidence that the defendant persuaded, encouraged, induced or enticed. *Crooker* at 1108. "The

10   limited interaction between Defendant and Minor F before Minor F sent the photo does not prove that

11   Defendant moved Minor F by persuasion or influence or brought about the photo by influence or

12   stimulation." *Id.* The limited facts as to uncharged counts in this case do not rise above the level seen

13   in either *Gagliardi* or *Crooker*.

14        The defense objects to the use of any facts not stipulated in the plea agreement and will request

15   a factual hearing, at which the government would have the burden of establishing facts by a

16   preponderance of the evidence, to prove up the pseudo-counts. The government will not put on

17   evidence of adjustments beyond those agreed upon in the plea agreement. And even if they did, they

18   might not prove the adjustments at issue. As a result, the guidelines that should be applied are those

19   applied by the parties in the plea agreement under §2G2.2.

20        Even if the stipulated facts were deemed sufficient to establish a basis for applying the

21   guidelines under §2G2.1(a), the specific offense characteristics should be calculated differently.

22        **2.    Objection Number Two: PSR ¶26 (USSG §2G2.1(b)(1)(B)):**

23        The Court should not apply two levels in this paragraph based on a finding of a specific age

24   category of victim.  This adjustment only applies if there is a cross-reference to §2G2.1.  For the

25   reasons stated above, such a cross-reference cannot be found in this case. Even if the Court were to

26   apply §2G2.1, there still remain no uncontested facts as to age. Specific age, beyond minor status, is

27   not admitted in the plea agreement and there are no stipulated facts to support it. The Defense

28   disputes any finding of age, and the government does not request an evidentiary hearing to meet its

1    burden.

2          **3.**     **Objection Number Three: PSR ¶27 (USSG §2G2.1(b)(2)(A)):**

3         For the reasons stated above, there should be no 2-level adjustment for commission of a sexual

4    act or sexual contact. This adjustment only applies if there is a cross-reference to §2G2.1.  For the

5    reasons stated above, such a cross-reference cannot be found in this case. The defense contests the

6    factual allegation that there was enticement in this case.

7         The guidelines in the plea agreement are supported by the only uncontested facts in this case.

8    The Total Offense Level should be 26 and the Criminal History Category I, for an advisory range of

9    63-78 months imprisonment. Even if the Court determines that a higher offense level applies, the

10    parties and Probation Officer jointly request a variance to 60 months imprisonment.

11    **III.   CONCLUSION**

12         Based on the foregoing, the defense respectfully requests that Mr. Escobar-Escobar be

13    sentenced to the term recommended by the Probation Office after extensive investigation:  60 months

14    imprisonment.

15

16         Dated:     November 26, 2025            Respectfully submitted,

17

18                                         JODI LINKER
                                     Federal Public Defender

19                                         Northern District of California

20                                          /S/
                                     JOHN PAUL REICHMUTH (CASBN

21                                         194844)
                                     Assistant Federal Public Defender

22

23

24

25

26

27

28

EXHIBIT A

# Federal Public Defender
## Northern District of California

*Jodi Linker*
*Federal Public Defender*

*Candis Mitchell*
*First Assistant Defender*

November 24, 2025

The Honorable Haywood S. Gilliam, Jr.
1301 Clay Street
Oakland, CA 94612

      Re: *United States v. Edgardo Escobar-Escobar* CR-4-24-00620-HSG Mitigation Report

**Identifying Data, Reason for Referral, Scope, and Purpose of Memorandum**

      Edgardo Escobar-Escobar (D.O.B. 12/8/2001) is a 23-year-old Salvadoran male who is currently incarcerated at Federal Correctional Institution (FCI) Mendota in Mendota, California. Mr. Escobar-Escobar was referred to this mitigation specialist by his attorneys, John Paul Reichmuth and Kaitlyn Fryzek, to summarize biopsychosocial information relevant to his case as identified by this writer. I hold a Master of Social Work degree with a specialization in health and wellness from the University of Denver. I am trained in mental health diagnostics using the American Psychiatric Association's Diagnostic and Statistical Manual (DSM-V). I also have a Licensed Clinical Social Worker credential in the state of California (License No. 129767). Before my current position, I worked at an inpatient dual diagnosis treatment facility providing intake assessments, case management, individual therapy, group therapy, discharge planning, and relapse prevention planning. The primary function of this report is to assist Mr. Escobar-Escobar's attorney in the collection of mitigation material as part of his legal advocacy.

**Sources of Information**

      The following sources were relied upon to produce this report. When no specific document or person is cited, the source of information is from interviews with Edgardo Escobar-Escobar.

The following records were reviewed in preparation for this memorandum:
- Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.: 0971 4:24CR00620-001 HSG prepared September 18, 2025, Pages 1-19
- San Francisco Jail Health Services Records Pages 1-11
- Zuckerberg San Francisco General Hospital Records Pages 1-46

The following interviews were conducted in preparation for this memorandum:
- Interviews with Edgardo Escobar-Escobar from April 4, 2025, to October 22, 2025
- Interview with Mr. Escobar-Escobar's girlfriend, Morena Carolina Chavez on April 17, 2025
- Interview with Mr. Escobar-Escobar's friend/former colleague, Fabiola Alonso on September 16, 2025
- Interview with Mr. Escobar-Escobar's friend/former colleague, Sherly Guiterrez on September 17, 2025

- Interview with Mr. Escobar-Escobar's friend/former colleague, Maria Ortiz on October 3, 2025

## Family Composition and Background

*I.    Family Structure*

Edgardo Escobar-Escobar was born on December 8, 2001, in Santa Ana, El Salvador to the union of his mother Blanca Escobar and father, Walter Escobar. Mr. Escobar-Escobar is the only child from the union of Walter and Blanca. Mr. Escobar-Escobar has three half-siblings from his mother's previous relationship, including his two brothers, Eder (30) and Aldi (34), and one sister, Ingrid (32).

*II.*



Mr. Escobar-Escobar's fear is a part of his experiencing adverse psychosocial and behavioral outcomes due to trauma exposure. Additional stressors in the surrounding environment, like witnessing intimate partner violence, increase a child's risk of internalizing emotions.[2] Mr. Escobar-Escobar learned from a young age that it was not safe to express how he felt because when he did, it resulted in further violence against himself or his mother.

*III.    Parental Separation and Environmental Instability*

As a child, Mr. Escobar-Escobar resided with his parents and half-siblings from birth to seven years of age in Santa Ana, El Salvador. Santa Ana was filled with gang violence and criminal activity. His family, especially his father, received gang threats from numerous local gangs. El Salvador is known for state-sponsored and gender-based violence. Organized crime, and street gangs are the main expressions of violence within the country.[3] Receiving gang threats in conjunction with his father's violence towards his mother further strengthened Mr. Escobar-

[1] Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.: 0971 4:24CR0620-001 HSG prepared September 18, 2025, Page 12

[2] Moylan, C. A., Herrenkohl, T. I., Sousa, C., Tajima, E. A., Herrenkohl, R. C., & Russo, M. J. (2010). The Effects of Child Abuse and Exposure to Domestic Violence on Adolescent Internalizing and Externalizing Behavior Problems. *Journal of family violence*, 25(1), 53–63. https://doi.org/10.1007/s10896-009-9269-9

[3] Pinzon, V. G. (2022b). Containing Violence in El Salvador: Community Organization, Transnational Networks and State–Society Relations. https://onlinelibrary.wiley.com/doi/10.1111/dech.12748

Mitigation Report, Edgardo Escobar-Escobar
Page 3 of 10

Escobar's fear for his safety both in and outside of his home. When Mr. Escobar-Escobar was around seven years of age, his father left El Salvador to come to the United States (U.S.) for a better life and to escape the gang threats. His father's move ended his parents' romantic relationship, resulting in Mr. Escobar-Escobar moving around often. After his father left, from eight to thirteen years of age, he resided with his paternal grandmother, Rosa Salvador. Mr. Escobar-Escobar is aware that his father sent money to his grandmother during this time to help financially support him.[4] Although his father provided financial support, he did not support Mr. Escobar-Escobar mentally, spiritually, physically, or emotionally. When Mr. Escobar-Escobar was 13 years of age, his mother started dating his stepfather Tony, but they separated when Mr. Escobar-Escobar was 15 years of age.

so he went back to live with his mother full-time between the ages of 13 and 16.

IV.



---

[4] Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.: 0971 4:24CR00620-001 HSG prepared September 18, 2025, Page 12

[5] Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.: 0971 4:24CR00620-001 HSG prepared September 18, 2025, Page 12

[6] Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.: 0971 4:24CR00620-001 HSG prepared September 18, 2025, Page 12

[7] Payne, J. S., Galvan, F. H., Williams, J. K., Prusinski, M., Zhang, M., Wyatt, G. E., & Myers, H. F. (2014). Impact of childhood sexual abuse on the emotions and behaviours of adult men from three ethnic groups in the

████████████████████████

V.    *Academic Hardship*

In school, Mr. Escobar-Escobar experienced bullying for his height, the way he talks, and how he dressed. Bullying has lasting consequences on physical, psychosocial, and academic achievement for youth.[8] Experiencing bullying in school and violence at home made Mr. Escobar-Escobar feel like he had nowhere safe to seek solace. While in school, he found solace through playing soccer. While in El Salvador, Mr. Escobar-Escobar went to school in a different "colonia," or neighborhood. On his way to school in El Salvador he would experience gangs trying to recruit him on his walk to school.[9] Normally he walked to school in groups for his safety due to the violence in the area. He would have to walk 30 minutes to school every day through coffee plantations. However, one day, at age sixteen he walked to school alone and he got jumped by a group of men that were hiding behind a wall. This incident made Mr. Escobar-Escobar fear for his life. Mr. Escobar-Escobar continued to face threats of violence in Santa Ana, El Salvador, if he did not join a gang. Mr. Escobar-Escobar described Santa Ana as being a "very violent place to live." The various gangs in the neighborhood would make recruitment efforts daily along his route between home and school. This ultimately led him to decide to flee for his and his family's safety so they would no longer be targeted.

## Life in the United States

I.    *Finding Refuge*

Around 16 years of age, Mr. Escobar-Escobar came to the U.S. and resided with his father Walter in Richmond, Virginia. He initially did not want to leave his mother's side, but the gang threats were getting so bad in El Salvador he felt forced to flee for his safety. It took Mr. Escobar-Escobar two tries to get into the U.S. On the first attempt he was detained by the Mexican Border patrol after about a month into his journey, which was guided by a "coyote." The second attempt took about three months. Both attempts to seek refuge in the U.S. occurred at 16 years of age, and he almost died both times from dehydration.

After arriving in the United States, he turned himself in to Immigration and Customs Enforcement (ICE) custody and was in immigration custody for six months and two days. He was sent to live in New York City, New York, and lived at the Cayuga Center where he started to learn English and received social services.

USA. *Culture, health & sexuality*, 10.1080/13691058.2013.867074. Advance online publication. https://doi.org/10.1080/13691058.2013.867074

[8] Committee on the Biological and Psychosocial Effects of Peer Victimization: Lessons for Bullying Prevention; Board on Children, Youth, and Families; Committee on Law and Justice; Division of Behavioral and Social Sciences and Education; Health and Medicine Division; National Academies of Sciences, Engineering, and Medicine; Rivara F, Le Menestrel S, editors. Preventing Bullying Through Science, Policy, and Practice. Washington (DC): National Academies Press (US); 2016 Sep 14. 4, Consequences of Bullying Behavior. Available from: https://www.ncbi.nlm.nih.gov/books/NBK390414/

[9] Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.: 0971 4:24CR00620-001 HSG prepared September 18, 2025, Page 15

Mitigation Report, Edgardo Escobar-Escobar
Page 5 of 10

## II.    Education

Mr. Escobar-Escobar then left New York to live with his father in Virginia from age 16 to 18. Growing up in El Salvador Mr. Escobar-Escobar's first language is Spanish. Mr. Escobar-Escobar completed the eighth grade in El Salvador. Coming to the U.S. was a culture shock to Mr. Escobar-Escobar. Since coming to the U.S., he has learned some English. Mr. Escobar-Escobar attended high school for about a year and a half in Virginia[10] while residing with his father. Despite his last grade of completion being the 8th grade in El Salvador, the principal would not let him start at a lower grade due to his age, so he started school in the U.S in the 10th grade and continued until part of 11th grade. He missed core parts of his high school education. Mr. Escobar-Escobar was set up to fail academically due to not receiving an adjustment in his grade level for the education he completed in El Salvador. If he did not excel in school or do all his house chores, his father Walter was violent towards him, often hitting him with whatever objects were nearby. Ultimately, Mr. Escobar-Escobar did not complete high school. Education is the principal pathway to financial security, social success, and stable employment. A low educational achievement, like Mr. Escobar-Escobar's partial high school completion, can create financial disparities and limit opportunities for the individual to achieve financial stability.[11]

## III.    Resumption of Paternal Abuse



Child maltreatment, what Mr. Escobar-Escobar experienced, can threaten or harm a child's health, dignity, or development.[13]

---

[10] Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.: 0971 4:24CR00620-001 HSG prepared September 18, 2025, Page 15

[11] Zajacova, A., & Lawrence, E. M. (2018). The Relationship Between Education and Health: Reducing Disparities Through a Contextual Approach. *Annual review of public health*, *39*, 273–289. https://doi.org/10.1146/annurev-publhealth-031816-044628

[12] Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.: 0971 4:24CR00620-001 HSG prepared September 18, 2025, Page 12

[13] Daley SF, Gonzalez D, Bethencourt Mirabal A, et al. Child Abuse and Neglect. [Updated 2025 Apr 11]. In: StatPearls [Internet]. Treasure Island (FL): StatPearls Publishing; 2025 Jan-. Available from: https://www.ncbi.nlm.nih.gov/books/NBK459146/



Shortly after Mr. Escobar-Escobar left, his father went back home to El Salvador to take care of his mother/Mr. Escobar-Escobar's grandmother, Rosa Sandoval. She suffers from a thyroid condition and high blood pressure. Mr. Escobar-Escobar has a close relationship with Rosa and is concerned about her health declining further.

Mr. Escobar-Escobar's mother regularly sees Mr. Escobar-Escobar's father in the community ████████████████████████████████████████[15]

*IV.     Unable to Escape Abuse*

Mr. Escobar-Escobar left Virginia and came to Fresno, California around age 18 and stayed with his friend Jose whom he met through social media for about six months. When he moved to Fresno, he stopped school completely and became socially isolated.



. Police were never called because Mr. Escobar-Escobar feared his situation would get worse, and that he would lose his housing stability. After this incident, Mr. Escobar-Escobar ended the relationship and moved to Richmond, California, for a few months.

---

[14] Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.: 0971 4:24CR00620-001 HSG prepared September 18, 2025, Page 13
[15] Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.: 0971 4:24CR00620-001 HSG prepared September 18, 2025, Page 14

Mitigation Report, Edgardo Escobar-Escobar
Page 7 of 10

V.    *Finding Support*

A few months after leaving Fresno Mr. Escobar-Escobar moved to Richmond, California, where he met his current girlfriend, Morena Carolina Chavez (36), who goes by Carolina and who is also from El Salvador. They met while they were out dancing and started dating. Mr. Escobar-Escobar also resided in Richmond for a few months before moving in with Carolina, her 17-year-old son David, Carolina's mother, Carolina's brother, and the husband of Carolina's mother in Hayward, California. Carolina currently resides with her son in San Leandro, California. Morena and Mr. Escobar-Escobar have been together for four years. They had intentions of getting married prior to his arrest and they already bought rings. But with the federal case happening, now they are unsure. Morena reported that she trusts Mr. Escobar-Escobar around David and that he has been a supportive partner who takes care of her son when needed, like taking him to school or soccer practice. Despite juggling two jobs with extremely long hours, Mr. Escobar-Escobar reports that living with Carolina was the most stability he has had in years. Carolina has struggled to stay afloat financially since Mr. Escobar-Escobar's incarceration. She works at Cardenas Market in San Leandro[16] as a cook/cashier/dishwasher but is struggling to support herself and her son financially. When Mr. Escobar-Escobar is deported, Carolina plans to return to El Salvador with him.

VI.    *Working towards Stability*

Mr. Escobar-Escobar completed part of the 11th grade in the United States. Starting at 13 years of age, he gained skills in agriculture from harvesting and planting corn and beans in El Salvador. Mr. Escobar-Escobar's employment history includes working as a supervisor at Fed Ex Ground in San Leandro full time from September 2024 to January 2025, when he was 23 years of age. He worked at a Mexican Restaurant, La Carreta, in San Leandro, California, for about three years as a cashier, cook, and dishwasher from 2022 to 2025. Mr. Escobar-Escobar's co-worker/friend Fabiola describes him as attentive and dependable. His co-worker/friend Sherly describes him as responsible, respectful, and reliable. His co-worker/friend Maria describes him as hard-working and mature. When he resided in Richmond, Virginia, he worked part-time as a painter with Monte Blanco. Prior to his arrest he had stable work. During the day he worked his Fed Ex job from 7:00 AM to 4:00 PM, and then at La Carreta from 4:00 PM to 9:00 PM. He thus worked from 14 hours almost daily.



Mr. Escobar-Escobar with his co-workers at his prior place of employment, La Carreta

**Health**

I.    *Mental Health*



---

[16] Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.: 0971 4:24CR00620-001 HSG prepared September 18, 2025, Page 13

Mitigation Report, Edgardo Escobar-Escobar
Page 8 of 10



*II.    Substance Use*



Mr. Escobar-Escobar's arm from past self-harm

Mr. Escobar-Escobar has a history of occasional alcohol use on social occasions since age 21 but outside of that has no history of substance use and has never received substance use treatment.

**Rehabilitation**

*I.    Facing Barriers*

Mr. Escobar-

---

[17] Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.: 0971 4:24CR00620-001 HSG prepared September 18, 2025, Page 14

[18] Lipari, R. N., & Van Horn, S. L. (2017). *Children Living with Parents Who Have a Substance Use Disorder.* Children living with parents who have a substance use disorder. https://www.samhsa.gov/data/sites/default/files/report_3223/ShortReport-3223.html

Peleg-Oren, N., & Teichman, M. (2006). Young children of parents with substance use disorders (SUD): A review of the literature and implications for social work practice. *Journal of Social Work Practice in the Addictions, 6*(1–2), 49–61.

███████████████████████████████████████████████████████████████

## II.    *Taking Accountability*

Mr. Escobar-Escobar understands that the damage to the victims in the case is immeasurable and lifelong due to the child sexual abuse material repeatedly being re-viewed. Mr. Escobar-Escobar does not make any excuses for his actions. He understands his conduct will result in deportation[19] and losing the life he built in the United States.

## III.    *Building a Brighter Future*

Mr. Escobar-Escobar's father is currently a bicycle mechanic, and his mother is a homemaker. Mr. Escobar-Escobar has a goal of building a house for his mother to give her a stable life. His Christian faith has been a major support, and he has been doing bible study.



Mr. Escobar-Escobar with his friends in Oakland, California

His mother suffers from chronic health issues and severe gastric problems, and he worries about her health declining before he is able to be reunited with her. He is actively participating in mental health treatment and went to his first therapist appointment on April 30, 2025, through the Hope Program where he participated in treatment up until he was remanded upon plea in July 2025. This is the first time in his life that he has received formalized mental health treatment. While in custody at FCI Mendota he has been studying English. He has goals of working in El Salvador at the Call Center in customer service. Mr. Escobar-Escobar must be bilingual in order to work there so he has been doing self-study, reading books, and speaking in English when he can. FCI Mendota does not offer programs for learning English, so he is relying on his own limited resources. The other incarcerated persons have been helping him practice his English. He has plans of residing near or with family when deported to El Salvador. He also has been proactive in requesting mental health services since entering custody at FCI Mendota, but he has not received a response yet regarding his request.[20] ████████████████████████████████████████████ ██████████████████████████████████████████████████ but he understands he needs to take responsibility for his past actions.

Mr. Escobar-Escobar is actively working on stabilizing physical and mental health through the medical care he is being provided at FCI Mendota. He has goals of consistently

---

[19] Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.: 0971 4:24CR00620-001 HSG prepared September 18, 2025, Page 11

[20] Presentence Investigation Report prepared by U.S. Probation Officer Brian D. Casai Docket No.: 0971 4:24CR00620-001 HSG prepared September 18, 2025, Page 14

Mitigation Report, Edgardo Escobar-Escobar
Page 10 of 10

engaging mental health treatment, furthering his education, and most importantly, being present
for his family.

Respectfully Submitted,

**Amanda Merfeld, LCSW**
Mitigation Specialist
Office of the Federal Public Defender
Northern District of California

# EXHIBIT B

Letter of support from Edgardo's prior colleague/friend, Sherly Rodriguez (Mr. Escobar-Escobar's middle name is Ernesto, which he uses at work)

To: The Honorable Judge Gilliam

     My name is Sherly Rodriguez. Through this letter I want to personally describe what Ernesto Escobar was like to me. He was a great friend and confidant with me. He was a kind, understanding person, both personally and professionally. I've known him for three years and this time I was able to discover a cheerful, fun person at work. He brought joy to our lives with his crazy antics and witty jokes. I can personally say that he was the joy of the taqueria, a very hard working and respectful person. Almost every conversation I've had with Ernesto Escobar was always about his mother. His mother is his driving force and his entire life. From him I truly learned that no matter how hard life is and no matter how difficult one goes through you have to be strong and never give up, always keep moving forward with your head held high no matter what. Ernesto Escobar taught me that true friends do exist and that it's not necessary to be of the same blood to care for, to protect, and to trust in each other through thick and thin, we will always be there. The truth and only the truth is what I can say about him, he has and will forever be a great person whom I love and respect very much for, and I will have a lot of affection for.

                                          Sincerely, Sherly Rodriguez.

Please feel free to contact me if needed.
Phone number:(510)-REDACTED
Gmail:REDACTED@gmail.com

Letter of Support from Edgardo's prior colleague/friend, Maria Ortiz

09/28/25

To. The Honorable Judge Gillian

     My name is Maria Ortiz, I am writing to you on behalf of Ernesto Escobar. I have known Ernesto Escobar for more than 3 years now. We used to work together at La Carreta Taqueria, Ernesto Escobar is a hard-working respectful young man, always willing to help others when in need. I remember there were times when I would enter work depressed and crying, he would be the person to make me feel better. His exact words would be "Maria don't cry I don't like to see you cry, you are like a second mother to me it makes me sad to see you cry".In some way those words will forever stick to me, because those exact words made me feel better and allowed me to go on with my day. Ernesto Escobar was always a responsible young man, he was always available for the boss whenever he needed someone to help. He was never late to work and I remember he would never miss a day of work. Ernesto Escobar had one goal set on his mind and that goal was to help his mother out. His mother was his main reason for him to be such a hard worker which surprised me at such a young age for him to be a hard worker and have such good thoughts and intentions.

Sincerely, Maria Ortiz

Please feel free to contact me if needed.
Phone Number: (510)-REDACTED
Email: REDACTED@yahoo.com

Letter of Support from Edgardo's prior colleague/friend German Avalos

Dear Judge

My name is German Avalos, and I'm writing on behalf of my dear friend, Ernesto Escobar, who

is currently detained. I have known Ernesto for 3 years, and during this time, I have come to

know him as an incredibly honest, kind, and thankful person. Ernesto has always been someone

who treats others with respect, helps those in need. He is a very good friend, someone who cares

about those around him. He has been a positive influence in our community and in my life

personally. It is deeply painful and it hurts me to see someone like him in prison, as it does not

reflect the person I have always known. We all make mistakes in this life. I understand the

seriousness of the law and responsibilities of the court, but I respectfully believe that Ernesto is

not someone who deserves to be punished in this way. I truly believe that he is capable of

contributing positively to society and should be given an opportunity to do so.

Thank you for taking the time to read my letter. I hope you can consider Ernesto's character and

the impact of this situation on his future .

Sincerely,

German Avalos

09/27/2025

Letter of Support from Edgardo's prior colleague/friend, Fabiola Alonso

Dear Judge,

My name is Fabiola Alonso and I have known Edgardo Escobar for the past 2 years and a half. Ever since I met him in our place of work "La Careta" he is one of the most kindest and loving humans I have ever met and all he does is for his mother that is in El Salvador and his wife that is here with us. Edgardo has always been very positive at our work place in my eyes he was the light of our work place no matter what was going on he always had a smile on his face. When I was feeling sad he always made me feel better and would always make me laugh . He was very social to everyone smiled at everyone helped anyone who was in need he never looked mad or sad he was always just filled with joy. When my son had a horrible car accident he took initiative in asking me to take over my shifts so I can be with my son not anyone would be so kind to do that. He was also always talk about his mother and how much this mother meant to him and he was always send her money because he was her financial support he always would tell me that he needs to send her money so she can have food every day and a roof over her head. Edgardo always has been a family person and I believe whatever is needed from him he is willing to do anything for a better him.

Sincerely,
Fabiola Alonso